IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| NEIL A. HAMILTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 05-0873-CV-W-REL-SSA |
| JO ANNE BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Neil Hamilton seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title
II of the Social Security Act ("the Act"). Plaintiff argues
that the ALJ erred in (1) failing to give controlling weight
to plaintiff's treating physician, Dr. Gemperli; (2) failing
to make adequate credibility findings; and (3) failing to
rely on an accurate hypothetical. I find that the
substantial evidence in the record as a whole supports the
ALJ's finding that plaintiff is not disabled. Therefore,
plaintiff's motion for summary judgment will be denied and
the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On November 7, 2002, plaintiff applied for disability
benefits alleging that he had been disabled since September

10, 2002. Plaintiff's disability stems from allergies, asthma, back problems, eye problems, and headaches. Plaintiff's application was denied on November 14, 2002. On November 8, 2004, a hearing was held before Administrative Law Judge Jack McCarthy. On April 7, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 25, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera

2

<u>Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id.</u>; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to

3

last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

4

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff; his mother, Elaine Hamilton; vocational expert, Marianne Lumpe; and medical expert, Arthur Gelzer, M.D., in addition to documentary evidence admitted at the hearing.

### A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1984 through 2004:

5

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1984 | $ 2,788.14 | 1995 | $14,143.74 |
| 1985 | 3,168.37 | 1996 | 18,506.41 |
| 1986 | 2,152.61 | 1997 | 19,557.54 |
| 1987 | 0.00 | 1998 | 20,377.75 |
| 1988 | 0.00 | 1999 | 20,039.55 |
| 1989 | 0.00 | 2000 | 21,181.36 |
| 1990 | 0.00 | 2001 | 21,211.96 |
| 1991 | 0.00 | 2002 | 13,733.79 |
| 1992 | 0.00 | 2003 | 0.00 |
| 1993 | 2,038.42 | 2004 | 0.00 |
| 1994 | 13,763.64 | | |

(Tr. at 95-100).

**CLAIMANT QUESTIONNAIRE**

In a Claimant Questionnaire dated November 27, 2002, plaintiff reported that he has trouble swallowing pills so he takes less medication than he is supposed to (Tr. at 112). His ability to care for himself has not changed since his disability (Tr. at 113). He is able to prepare soup, grill hamburgers and steak; bake potatoes, make frozen dinners and pizza (Tr. at 113). He has no additional difficulty preparing meals because of his disability (Tr. at 113). He has no difficulties following directions (Tr. at 113). He needs no help doing grocery shopping (Tr. at 113).

6

He is able to use the dishwasher, mop, dust, vacuum, clean the house, do laundry, play the guitar, and play chess (Tr. at 113-115). He goes to concerts but not as often as he used to (Tr. at 114). He has difficulty driving because he cannot tolerate sunlight, headlights, or streetlights (Tr. at 114). Plaintiff drives only when he has to, a few miles per week (Tr. at 114). He goes to the grocery store, fast food restaurants, pet store, and the doctor (Tr. at 114).

**CLAIMANT QUESTIONNAIRE SUPPLEMENT**

In a Claimant Questionnaire Supplement dated December 1, 2002, plaintiff stated that he does household chores like grocery shopping, laundry, mopping, vacuuming, dishes, and carrying out the trash (Tr. at 124). He takes his mother for a walk every day or so for exercise (Tr. at 124). He reported that he can only sit, stand, walk, kneel, squat, climb stairs, reach forward or backward, and reach overhead for a "short time". He can lift or carry only a small or limited amount, and bending is "very, very limited" due to his back pain.

**B.    *SUMMARY OF TESTIMONY***

During the November 8, 2004, hearing, the following individuals testified:  plaintiff; his mother, Elaine

Hamilton; vocational expert, Marianne Lumpe; and medical expert, Arthur Geltzer, M.D.

## 1. Plaintiff's testimony.

Plaintiff was 39 years of age during the administrative hearing and is currently 41 (Tr. at 24). He finished tenth grade in high school and has a GED (Tr. at 24-25).

Defendant has not worked since his alleged onset date (Tr. at 25). He has been living with his mother, and he uses the money from his 401(k) retirement fund from his last job working in a warehouse (Tr. at 25). During that job, plaintiff lifted varying weights from light to about 50 pounds (Tr. at 25). He had to read the invoices and could not see the numbers, and he had to rest his eyes (keeping them shut) after a couple of hours (Tr. at 32). Defendant could only look at the computer screen for short periods of time (Tr. at 32).

Defendant left the warehouse job after 8 1/2 years because his eye problem got progressively worse (Tr. at 26). He did not quit, but he could not make it back in to work, so they let him go (Tr. at 26, 37). While he worked there, he had the ongoing problem of maintaining his attendance (Tr. at 27). On average, plaintiff was missing about a day

8

per week (Tr. at 27). This was due to the problems with his eyes, the swelling, and the headaches (Tr. at 27).

Plaintiff has glaucoma in his left eye, and he is blind in that eye (Tr. at 37). Plaintiff's left eye swells, both on the outside which is visible and he has swelling on the inside causing pressure (Tr. at 28). Plaintiff's left eye itches and burns, he rubs it a lot, and it is constantly watering (Tr. at 29).

There is a good chance that plaintiff will develop glaucoma in his right eye (Tr. at 37). Plaintiff's right eye is very sensitive to light and he struggles with that a lot (Tr. at 28, 29). All light bothers plaintiff unless it is very faint (Tr. at 29). He wears very sensitive sunglasses inside, and when he goes outside he has to combine two pairs of glasses to block out the light (Tr. at 29). Wearing two pairs of glasses makes it difficult to see because it cuts his vision (Tr. at 29). Plaintiff also has floaters in his right eye (Tr. at 31). The floaters make it look like there is something there, but there is not (Tr. at 31).

Plaintiff has severe allergies for which he takes over-the-counter Alavert (Tr. at 30). He gets a shot every week from his allergist (Tr. at 31). He also uses two inhalers

9

for his asthma that is caused by his allergies (Tr. at 31).
Without his allergy medication, he feels like he has the flu
(Tr. at 31).

Plaintiff has headaches every day, sometimes just
pressure but sometimes severe headaches (Tr. at 36).

Plaintiff hurt his back from lifting all the time (Tr.
at 33). It was not a single injury, it progressed to where
he could hardly move because his back would tighten up (Tr.
at 33). Plaintiff went to the emergency room and was given
muscle relaxers and pain pills (Tr. at 33). His doctor said
he had a herniated disc from bending and lifting (Tr. at
33). Plaintiff had epidural shots which helped, but when
they wore off his back hurt even worse (Tr. at 33-34). The
pain goes into his left leg, and it will feel better if he
can lie on the floor (Tr. at 34).

Plaintiff drives to the grocery store, which is a mile
or two away, about once a week (Tr. at 29-30). Plaintiff
cannot see signs or addresses, and he cannot drive in
traffic (Tr. at 30). He can only drive somewhere close to
home (Tr. at 30).

Plaintiff estimated he could stand for a couple of
hours before having back pain (Tr. at 34-35).

10

Plaintiff normally gets up at 9:00 in the morning and tries to help his mother with something, like the dishes or the laundry (Tr. at 35). After doing that one thing, he will rest for the remainder of the day (Tr. at 35). One of his impairments would not prevent him from doing more than one task a day, but the combination of all his impairments prevents any more activity (Tr. at 35). His back prevents activity and he needs to rest his eyes (Tr. at 36).

## 2. Medical Expert Testimony.

Dr. Gelzer, a medical expert, has never treated or examined plaintiff (Tr. at 40). Dr. Gelzer reviewed medical records from Dr. Gemperli (two visits two years apart), and the questionnaire prepared by Dr. Gemperli (Tr. at 41).

Dr. Gelzer testified that although the records state that plaintiff has congenital glaucoma "by history", there is no description of the left eye that confirms that congenital glaucoma is the problem (Tr. at 42-43). Congenital glaucoma is a bilateral disease, and there is nothing in the description of the right eye to suggest there is congenital glaucoma in the right eye (Tr. at 43). It is very, very rare for someone to have congenital glaucoma in one eye, because it is a genetic defect that would have to be bilateral (Tr. at 45-46).

11

After hearing the testimony of plaintiff's mother, Dr. Geltzer understood that plaintiff does indeed have congenital glaucoma but that it is "very quiet" in the right eye (Tr. at 51). He said he does understand the light sensitivity, but does not understand why it is not being treated (Tr. at 52).

Glaucoma resulting in blindness can cause pain, swelling, tearing, and irritation if the eye becomes atrophic and deteriorates as a working organ (Tr. at 43, 44). There is no treatment for such a thing other than nucleation (removal of the eye) (Tr. at 43, 47). Although there is no treatment for the condition, there are treatments for the symptoms (Tr. at 47). To help with pain and irritation, patients can use lubricating drops, topical steroids, and sometimes oral steroids (Tr. at 47). Chronic elevation of the intraocular pressure does not cause pain, although acute elevation of the intraocular pressure can cause severe pain (Tr. at 46).

Dr. Gelzer testified that Dr. Gemperli's failure to treat the problem with the left eye makes him question the severity of the problem (Tr. at 43-44). There is no mention in the treatment records of an irregular corneal surface, which would lead to the discomfort (Tr. at 44).

12

Plaintiff's light sensitivity complaints do appear in Dr. Gemperli's records (Tr. at 48). The normal treatment for that would be to use glasses that reduce light levels (Tr. at 48).

### 3. **Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the request of the Administrative Law Judge. Ms. Lumpe testified that plaintiff previously worked as a warehouse worker at the medium exertional level, and it was an unskilled job (Tr. at 53).

The ALJ asked the first hypothetical which involved a person who can lift up to 20 pounds occasionally and ten pounds frequently, can stand or walk six hours per day, can sit for six hours per day, should avoid working in the sunshine, and needs to be able to wear tinted glasses when working indoors (Tr. at 54). The person is limited to occasional stooping and crouching; should avoid concentrated exposure to vibration, dust, gasses, fumes, odors, and poor ventilation (Tr. at 54). The person is blind in the left eye which results in limited depth perception (Tr. at 54).

The vocational expert testified that such a person could perform light unskilled work such as the job of intraoffice messenger (Tr. at 54). There are 500 to 700

13

such jobs in the greater Kansas City area, about 1,500 in Missouri, and about 110,000 in the nation (Tr. at 54). Such a person could also be a cashier II, with 4,000 to 5,000 jobs in Kansas City, 12,000 in Missouri, and 600,000 in the nation (Tr. at 55). The person could also be a duplicating machine operator with 80 such jobs in Kansas City, 200 in Missouri, and 11,000 in the country (Tr. at 55).

The vocational expert testified that such a person could also perform sedentary work such as information clerk (125 to 130 in Kansas City, 200 in Missouri, and 16,000 in the country), security system monitor (800 to 900 in Kansas City, 2,500 in Missouri, and 300,000 in the country), and semi-conductor assembly wire wrapper (2,000 in Kansas City, 7,000 in Missouri, and 350,000 in the country) (Tr. at 55).

If the hypothetical person needed to have unscheduled breaks or a break every two hours due to eyestrain or eye related problems, the person could not work (Tr. at 56-57). Watching a television monitor is the essential function of the job of security system monitor, which takes a lot of eye activity (Tr. at 57). Because the only eye impairment was depth perception, the vocational expert believed the hypothetical person could perform this job (Tr. at 58).

14

If the person were to miss more than one day of work per month, or at the most 15 days per year, he could not be gainfully employed (Tr. at 58).

**4.   Testimony of plaintiff's mother.**

Plaintiff was born with glaucoma, but it was not diagnosed until he was six months old when they took him to an ophthalmologist (Tr. at 49).  Plaintiff had surgery the next day (Tr. at 49).  Both of his eyes were gray like a blind dog (Tr. at 49).  That ophthalmologist said plaintiff's condition was very rare because he was blind in one eye but was reaching for the doctor's stethoscope, meaning he could see out of one eye (Tr. at 50).  The doctor told plaintiff's mother that normally the glaucoma should be in both eyes (Tr. at 50).

That ophthalmologist died, and plaintiff was treated by Dr. Lawrence Hamtil for nine years (Tr. at 50).  She took plaintiff to see Dr. Hamtil two to three times a week because he was expecting the glaucoma to go into the other eye (Tr. at 50).  Dr. Hamtil wanted to wait until plaintiff's face was done growing and then take the eye out and put in a false eye (Tr. at 50).  By the time plaintiff was 15, the doctor was ready but plaintiff refused to have it done (Tr. at 50).

Over the past two years, plaintiff's condition has worsened (Tr. at 60). He now is exhausted and lies on the floor because of his back problem (Tr. at 60). Because of having to wear two pairs of sunglasses, plaintiff cannot find something like a can of beans at the store (Tr. at 60).

Plaintiff's light sensitivity has become worse (Tr. at 60). Now the eye doctor cannot even look in plaintiff's eye with a penlight (Tr. at 60). Plaintiff's doctors have tried to treat him for the light sensitivity, but he's allergic to all the different kinds of drops (Tr. at 60-61). The drops make his eye swell up; get purple, red, and blue; and they run (Tr. at 61).

If you dim the lights way down, plaintiff's good eye can see (Tr. at 61). But in regular light, he cannot see (Tr. at 61).

**C.    *SUMMARY OF MEDICAL RECORDS***

Plaintiff submitted his relevant medical records along with childhood records providing the background for his eye impairment.

On April 21, 1973, plaintiff (who was 7 years old at the time) saw Lawrence Hamtil, M.D., an ophthalmologist, and reported headaches over his eyes and he continued to be light sensitive (Tr. at 186).

16

On April 27, 1973, Dr. Hamtil wrote a letter to W. Lee Murray, M.D., stated that plaintiff had had surgery to reduce the pressure in his left eye, and that the surgery went "superb" (Tr. at 185).

On August 22, 1973, plaintiff saw Dr. Hamtil for a check up (Tr. at 186). The vision in his right eye was 20/20.

On May 11, 1974, plaintiff saw Dr. Hamtil reporting that his vision seemed to blur in his right eye holding glasses (Tr. at 186). The vision in his right eye was 20/20. Dr. Hamtil gave plaintiff a prescription for plastic syn glasses for use in swimming if necessary.

On May 10, 1975, plaintiff saw Dr. Hamtil and reported no specific problems throughout the past year (Tr. at 184). He had glasses which Dr. Hamtil suggested he wear at school but may go without them when he is not in school if desired.

On June 21, 1976, plaintiff saw Dr. Hamtil and stated that his glasses were "increasingly helpful to him for seeing distance." (Tr. at 184).

On June 23, 1976, plaintiff's mother spoke with Dr. Hamtil who told her it was fine to let plaintiff take karate (Tr. at 183).

On December 28, 1976, plaintiff saw Dr. Hamtil for a check up (Tr. at 183). His vision in his right eye was 20/30.

On December 13, 1977, plaintiff saw Dr. Hamtil and reported that he was doing fine since last year (Tr. at 182). "He gets along fine with his glasses when he wears them." Vision in his right eye (VOD) was 20/20.

On December 6, 1978, plaintiff saw Dr. Hamtil and reported no problems, no allergies, no medications (Tr. at 182). Plaintiff said he wears his glasses occasionally. Vision in his right eye was 20/30.

On December 10, 1979, plaintiff saw Dr. Hamtil reporting fading vision in his right eye (Tr. at 181). His vision in his right eye after correction was 20/30. That same day, Dr. Hamtil wrote a letter to Dr. O'Connell (Tr. at 180). He wrote, "Concerning Neil, it is noted that while he has a history of congenital glaucoma, he does continue to have very good vision in his right eye with slight myopia [nearsightedness]. The left eye continues to have concerns established now and then regarding pressure, and quite frankly, his present pressure is 26 in the left

18

eye, and we are looking at the possibility of treating this with some Timoptic[1] in order to reduce the pressure."

On December 19, 1979, plaintiff's mother called Dr. Hamtil and reported that plaintiff was having headaches which were quite severe and pounding (Tr. at 181). "The association with Timoptic was considered simply because he had some eyedrops in the early years of care of Dr. May to which he became allergic or had some reaction. She was assured that the medication was probably not related or cross reactive; however, she states it is worth stopping the medication until the headaches have disappeared and then return to the medication in a few weeks to see if there is any associated headache return."

On August 16, 1982, plaintiff told Dr. Hamtil that he had no problems with his left eye, the discomfort was negligible. "Vision is satisfactory with his present glasses. Present dark glasses help avoid sensitivity." Plaintiff was taking Diamox[2] and using Timoptic eye drops.

On October 11, 1982, plaintiff saw Dr. Hamtil (Tr. at 179). "Pain left eye is intense all the time. Doesn't see

---

[1]A beta blocker which reduces pressure in the eye.

[2]Used to treat glaucoma by reducing the activity of a certain protein.

19

anything at all.  Uses medications poorly, capsules didn't work."  Dr. Hamtil suggested breaking open the capsules and mixing them in a milk shake twice a day.  The vision in plaintiff's right eye was 20/20.

On October 18, 1982, Dr. Hamtil noted that plaintiff was having very little discomfort (Tr. at 178).  The vision in his right eye (VOD) was 20/20.

On October 25, 1982, Dr. Hamtil noted that plaintiff was having some trouble taking his pills he was prescribed to reduce the pressure in his eye (Tr. at 178).  "Plan trabeculectomy[3] OS [left eye] at his earliest convenience."

On November 1, 1982, plaintiff's mother called Dr. Hamtil and said plaintiff had decided to cancel the surgery as he felt it would not help anyway.  "He has refused to have the physical needed for the surgery and won't take the medication prescribed.  He told his mother that he would try taking the medication again, but he just doesn't see that it is going to work as he can't swallow the pills.  Mrs. Hamilton feels that for a boy his age (he was 17) it is kind

---

[3]A procedure wherein an incision is made in the eye in order to allow fluid (aqueous humor) to drain out of the eye, bypassing the clogged drainage channels of the trabecular meshwork.

20

of hard to tell him what to do so she suggests that we cancel the surgery according to Neil's instructions."

On July 23, 1984, Dr. Hamtil sent a letter to plaintiff reminding him that his last appointment had been on October 25, 1982, and that it is important to have regular follow-up care (Tr. at 177).

September 10, 2002, is plaintiff's alleged onset date.

On October 20, 2002, William Reed, Jr., M.D., completed a form recommending plaintiff to return to work with the following restrictions: medium light work with a 35 pound lifting limit on an occasional basis for four weeks. No other restrictions were checked on this form.

On October 22, 2002, plaintiff saw William Reed, Jr., M.D., for lower back pain (Tr. at 155-156). Plaintiff was in the emergency room[4] on August 21, 2002, for his back and had not had treatment since that time. Plaintiff had not worked since September 9, 2002, due to aggravation of his back pain while working.

> PHYSICAL EXAMINATION: On examination, this gentleman's heel and toe walking is performed well. Anterior spine flexion shows fingers reach within 12" of the floor.

---

[4]There are no records of this emergency room visit.

Lateral spine flexion and hyperextension is limited 30%. Sitting and supine straight leg raising causes back pain at 60 elevation without sciatica. Detailed motor and sensory examination is normal. . . .

X-RAYS: Lumbosacral spine x-rays taken today include flexion and extension views. There is no segmental spinal instability noted. The L5-S1 disc space is diminished approximately 50%. There are no facet or vertebral body osteophytes present of any significance.

IMPRESSION:
1. Degenerative disc changes L5-S1.
2. Lumbalgia.

CAUSATION: This gentleman's job activities could certainly lead to his present complaints of lumbalgia. It would be my impression that this gentleman was never totally disabled but could have returned to work with a 20-30 lb. weight lifting limitation in place, with limitations additionally of no frequent, repetitive, or continuous bending or twisting.

RECOMMENDATIONS: A Functional Capacity Evaluation I believe should be ordered to determine the veracity of this gentleman's complaints and his current light duty work capacity. Additionally, an MRI scan of the lumbar spine should be performed due to complaints persisting over a month. In terms of treatment, medications prescribed are Vioxx[5], Skelaxin[6], and Ultram[7] for pain. I will have him return to see me following the aforementioned tests for determination of any further therapeutic modalities which may be necessary. He has not reached maximum medical improvement at the present time.

---

[5]Vioxx is a non-steroidal anti-inflammatory.

[6]Skelaxin is a muscle relaxer.

[7]Ultram is a pain reliever for moderate to moderately severe pain.

Case 4:05-cv-00873-REL   Document 15   Filed 09/25/06   Page 22 of 51

On October 29, 2002, plaintiff saw Amy Gemperli, M.D. for a check up on his eyes (Tr. at 171, 174, 176). He stated that his eye waters causing headaches and he had floaters. His vision was 20/25 in the right eye.

On November 1, 2002, plaintiff had an MRI of the lumbar spine performed by Larry Nussbaum, M.D. (Tr. at 157). The results were:

1.  Disc extrusion, small, at L2-3 with minimal mass effect on the thecal sac[8].

2.  Left disc extrusion L5-S1 central to the left which appears to at least touch the left S1 nerve root.

3.  Intact foramina[9].

4.  Degenerative disc disease.

On November 5, 2002, plaintiff was seen at Aggarwal Allergy Clinic for a skin test (Tr. at 137-138). There is nothing which explains whether any of the skin tests were positive.

--------

[8]A thin walled tube filled with cerebrospinal fluid ("CSF") that surrounds the spinal cord. CSF is the cushiony fluid that protects the brain and spine and helps distribute nutrients to these structures.

[9]A foramen is a natural opening or perforation through a bone or a membranous structure.

23

On November 11, 2002, Jacqueline Worthington, MSPT, prepared a functional capacity evaluation (Tr. at 140-143). She wrote that "The results of this evaluation indicate the Neil Hamilton is functioning in the medium work Physical Demand Category for full time employment. . . . Please note that floor to knuckle lift and carry are indicative of what he is wiling to perform within his perceived pain tolerance and not necessarily his maximum capabilities."

Plaintiff had stated that he believed he could sit for 30 minutes, stand for 30 minutes, walk for 30 minutes, drive for 30 minutes and lift 15 pounds. He said he was independent with activities of daily living. Plaintiff normally gets up at 9:00 and helps his mother with chores, then he watches television until he goes to bed at midnight. He does not perform an exercise program other than occasional walking throughout the day.

Plaintiff had a normal gait, no tenderness in his lumbar paraspinals, increased tightness in bilateral hamstrings and quadriceps. Lumbar flexion was 55 degrees, extension 10 degrees, right sidebending 25 degrees, left sidebending 20 degrees. Cervical range of motion and upper and lower extremities were within normal limits.

24

Plaintiff was able to occasionally lift 35 pounds floor to knuckle; 45 pounds knuckle to shoulder; and 40 pounds overhead. He could occasionally carry 50 pounds for 100 feet with both hands. Plaintiff was able to frequently lift 25 pounds floor to knuckle; 2 pounds knuckle to shoulder; and 20 pounds overhead. He could frequently carry 30 pounds for 100 feet with both hands. Plaintiff was able to occasionally push a cart with 275 pounds, pull a cart with 275 pounds, sit, stand, walk, climb stairs, climb ladders, balance, stoop, kneel, crouch, crawl, reach overhead, reach desk level, reach floor level, grip with his hands, handle, and finger.

Ms. Worthington stated that plaintiff was performing medium work, exerting 20 pounds to 50 pounds of force occasionally and/or 10 pounds to 25 pounds of force frequently, and/or greater than negligible up to ten pounds of force constantly to move objects.

On December 3, 2002, plaintiff saw Howard Aks, M.D., at the KC Pain Centers for lower back pain (Tr. at 149-151). Plaintiff reported experiencing back pain two to three months earlier after having lifted some heavy objects. He had been participating in physical therapy and had tried Vioxx [anti-inflammatory], Skelaxin [muscle relaxer], and

25

Ultracet[10] "to much benefit".  An MRI scan had been obtained
which showed a disk extrusion at the L2-3 level, a left disk
extrusion at the L5-S1 level, which appeared to touch the
left S1 nerve root.  Walking makes his pain better, lifting
and bending make it worse.  "He does smoke and occasionally
drinks.  We did talk about smoking and back problems."  His
current medications were Clarinex [antihistamine], Vioxx,
Skelaxin, and Ultracet.  Straight leg raising was negative.
Examination of the dorsal spine revealed normal alignment,
he was nontender to palpation over the lower facet joints
and the sacroiliac joints.  His pain was not worse with
extension or lateral rotation, was not effected with flexion
of the spine.

Dr. Aks recommended a series of epidural steroid
injections.  The first injection was given that day.

On January 7, 2003, plaintiff was seen by Howard Aks,
M.D., at KC Pain Centers (Tr. at 147, 148).  Plaintiff had
had his first epidural steroid injection on December 3, and
he stated this date that he did not receive benefit from
that shot.  Plaintiff had his second steroid injection on
this visit.

―――――――――――――

[10]A combination of acetaminophen (Tylenol) and Ultram
(a pain reliever).

26

On January 21, 2003, plaintiff saw Howard Aks, M.D., at KC Pain Centers (Tr. at 146). Dr. Aks noted plaintiff had had his second epidural steroid injection for his lower back two weeks earlier, and plaintiff this day stated the injection was beneficial. The pain was decreased and less frequent. Plaintiff had a third steroid injection.

On February 4, 2003, William Reed, Jr., M.D., wrote, "This gentleman is doing very well after epidural steroid injections. Thus, I will have him return to see me in three months. He is returned to regular duties at work and hopefully in this regard he will be successful." (Tr. at 153).

On February 25, 2003, a Disability Determinations physician (the name appears to be Dr. Higgins) completed a Physical Residual Functional Capacity Assessment (Tr. at 159-166). Dr. Higgins found that plaintiff could occasionally lift 20 pounds and frequently lift ten pounds, stand or walk for six hours per day, sit for six hours per day, and had an unlimited ability to push or pull (Tr. at 160). In support of those findings, Dr. Higgins wrote, "2/4/03 doing very well after epidural injections; 1/21/03 third epidural shot received, 11/02 moderate disc disease on MRI L-spine".

27

Dr. Higgins found that plaintiff could occasionally stoop and crouch, and could frequently climb, balance, kneel, and crawl (Tr. at 161). Plaintiff had no manipulative limitations, such as reaching and handling (Tr. at 162). He had no visual limitations with near and far acuity or color vision, but was limited in depth perception, accommodation, and field of vision (Tr. at 162). Plaintiff had no communicative limitations and no environmental limitations other than to avoid concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation (Tr. at 163). In support of all of those findings, Dr. Higgins noted that plaintiff was cleared to return to work on February 4, 2003, with regular duties; he received benefit from three epidural shots; and activities of daily living dated 11/27/02 were not very limited due to his back. Dr. Higgins also noted that plaintiff was cleared for medium light work in October 2002, and medium work on November 11, 2002.

On February 27, 2004, plaintiff saw Amy Gemperli, M.D. (Tr. at 173). The form states under chief complaint: "Pt needs form filled out for disability -- hasn't been able to work for over a yr. Pt. still complains of floaters and light sensitivity." Plaintiff's vision was 20/20 in his

28

right eye.  Dr. Gemperli wrote, "Pt. is <u>very</u> difficult to examine."

On February 27, 2004, Amy Gemperli, M.D., completed Vision Interrogatories (Tr. at 168-170).  Dr. Gemperli found that plaintiff has congenital glaucoma, as supported by increased intraocular pressure, and records dating to the late 1960's detailing the history of plaintiff's congenital glaucoma.  The condition does not affect both eyes, and Dr. Gemperli found that plaintiff has 20/20 vision in his best eye after correction.  Dr. Gemperli was asked the following questions:

> Is it reasonable to expect that the patient would experience frequent headaches?  "yes"
>
> Is it reasonable to expect that a person afflicted by this disorder would be subject to easy eye-fatigue? "yes"
>
> Because of easy-eye fatigue, would the patient have to rest eyes frequently?  "yes"
>
> Would the patient have difficulty concentrating his/her vision on an object for periods of two hours?  "yes"
>
> Would the patient experience frequent occasions when he/she would have "double vision"?  "no"
>
> Would the patient experience a loss or diminution of depth perception?  "yes"
>
> Would the patient experience tunnel or gun barrel vision?  "no"
>
> Has the patient experienced retinal hemorrhaging?  "no"

Would the patient experience difficulty in reading?
"yes"

Would it be reasonable to expect that the patient's
eyes would water excessively?  "yes"

Do you believe the patient has the ability to complete
a normal day of work and work week without
interruptions and to perform at a consistent pace
without unnecessary numbers and lengths of rest
periods?  "no"

Finally, Dr. Gemperli wrote that the symptoms described

in this questionnaire have been present since birth, and

that "that patient is also extremely light sensitive in the

right eye."

On December 14, 2004, Dr. Gemperli wrote a letter to

plaintiff's attorney (Tr. at 194).  The letter states as

follows:

I'm writing regarding Mr. Neil Hamilton.  He is a 37
year old man with a history of congenital glaucoma.  He
was diagnosed when he was seven days old.  Currently,
Mr. Hamilton's vision is 20/25 in the right eye and has
no light perception in the left eye.  His intraocular
pressures were 16 in the right eye which is normal and
40 in the left eye.  There is no view into the left eye
as the cornea is opacified. On dilated examination, the
right eye is normal.  Additionally, Mr. Hamilton is
extremely light sensitive.  He was actually quite
difficult to examine, because of his extreme light
sensitivity.

In summary, Mr. Hamilton has congenital glaucoma and is
blind from it in the left eye.  His right eye appears
to be fairly normal with good vision.  He does has
[sic] extreme light sensitivity.

30

## V.  FINDINGS OF THE ALJ

The ALJ entered his opinion on April 27, 2005, finding plaintiff not disabled (Tr. at 14-21).

The ALJ first found that plaintiff had filed a previous application for disability benefits on February 4, 1993, but that application was denied and the ALJ did not reopen that case (Tr. at 14, 15).  The ALJ found that plaintiff is insured through December 31, 2007 (Tr. at 15).

At the first step of the sequential analysis, the ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 15).  He found that plaintiff has the following severe impairments:  back pain, asthma, and vision problems including left eye blindness and light sensitivity in the right eye (Tr. at 15).  However, plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15-16).

The ALJ found plaintiff's testimony not credible (Tr. at 16-19).  He then determined that plaintiff retains the residual functional capacity to lift or carry up to 20 pounds occasionally and ten pounds frequently, sit for six hours, and stand for six hours (Tr. at 19).  He should avoid working in sunshine and should wear tinted glasses when working indoors (Tr. at 19).  He is limited to occasional

stooping and crouching; he should avoid concentrated exposure to vibration, dust, gases, fumes, odors, and poor ventilation; and he has limited depth perception due to blindness in the left eye (Tr. at 14).

At step four of the sequential analysis, the ALJ found that plaintiff's past relevant work includes medium unskilled work as a warehouse worker, and that plaintiff cannot return to that past relevant work (Tr. at 19). However, at step five, he found that plaintiff can perform the following jobs: intraoffice messenger, cashier II, duplicating machine operator, information clerk, security system monitor, and wire wrapper, all of which are available in significant numbers in the Kansas City area, the state of Missouri, and the United States as a whole (Tr. at 20). Therefore, the ALJ found at step five of the sequential analysis that plaintiff is not disabled (Tr. at 20).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin

v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the

33

symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is one factor to be considered in evaluating the credibility of the claimant's allegations and complaints. . . .

> Notwithstanding that the medical record supports a finding the claimant has some visual limitations and back pain, the evidence does not substantiate his allegations of disabling limitations. With regard to back injury, the claimant reported he sustained a low back injury while at work. On one occasion, he reported this occurred on August 20, 2002 while lifting computer monitors. On another occasion, he related this occurred while lifting a heavy object in September 2002. He was seen in the emergency room and muscle relaxers were prescribed.

> . . . Dr. Reed assessed degenerative disc changes L5-S1 and lumbalgia. He opined the claimant was never totally disabled, but could have returned to work with a 20 to 30 pounds weight lifting limitation as well as limitations of no frequent, repetitive, or continuous bending or twisting. On October 22, 2002, Dr. Reed indicated the claimant could return to work lifting and/or carrying 25 pounds occasionally. . . .

34

A Functional Capacity Evaluation (FCE) performed on
November 11, 2002 demonstrated the claimant was able to
perform medium work, involving exerting 20 to 50 pounds
of force occasionally, and/or 10 to 25 pounds of force
frequently, and/or greater than negligible up to 10
pounds of force constantly to move objects.  A floor to
knuckle lift and carry were indicative of what he was
willing to perform within his perceived pain tolerance
and not necessarily his maximum. . . .

The claimant was followed by Howard A. Aks, M.D., a
pain clinic physician. . . .  Dr. Aks provided his
impression of lower back pain secondary to spinal
pathology.  He advised the claimant to proceed with
epidural steroid injections.  By January 21, 2003, the
claimant had received three injections.  Dr. Reed noted
on February 4, 2003 that the claimant did well after
the epidural injections and could return to regular
duties.

Based on this evidence there is no showing that the
claimant is disabled by a back impairment. . . .  [N]o
treating or examining physician opined the claimant was
totally disabled due to back pain.  His treating
physician, Dr. Reed, opined he was never disabled and,
even weeks after his initial complaint, he could
perform what is essentially work of medium exertion.
After epidural injections, Dr. Reed opined the claimant
could return to work without limitation.  Thus, neither
the objective medical evidence nor the opinions of the
claimant's treating physicians support subjective
allegations and bolster the claimant's credibility.

. . .  The claimant, who has been blind in his left eye
since birth, now contends that his left eye blindness
precludes him from working. . . .

He was treated by ophthalmologist Amy Gemperli, M.D.,
who specialized in glaucoma. . . .  Dr. Gemperli
recorded his right eye vision as 20/25 and she noted he
had no light perception in the left eye. . . .  On
dilated examination, the right eye was normal.
Additionally, the claimant was extremely sensitive to
light and, therefore, difficult to examine.

35

. . . Dr. Gemperli indicated that the claimant had congenital glaucoma. . . . According to her statement, this condition affected only the left eye and his vision in the right eye was 20/20. . . . She opined it was reasonable for the claimant to experience frequent headaches, easy eye fatigue which required frequent rest of the eye, difficulty concentrating his vision on an object for periods of 2 hours, a loss of depth perception, difficulty reading, and excessive watery eyes. Furthermore, she noted the claimant was extremely light sensitive in the right eye.

. . . [Dr. Gelzer, the medical expert] noted no prescription pain medication was provided for complaints of eye pain or headaches.

Thus, the claimant's credibility as to disabling functional limitations is diminished because of the lack of objective evidence to support his allegation. The testimony of the medical expert does not support the claimant's allegations of disabling limitations, which are contradicted by his lifelong activities. Despite his congenital left eye blindness, the claimant has worked with his vision impairment. He does not proffer any explanation of why his vision would have prevented him from continuing to work on September 10, 2002, but not before that date. Instead, the alleged onset of disability is related to a back injury. There is no evidence of any further treatment for a back impairment after February 4, 2003 when he was returned to regular duties at work. The medical expert noted there was no treatment for the complaints of the swelling, pain and watery left eye and no investigation of the cause for light sensitivity in the right eye. While it is reasonable that he may experience increased pain due to atrophy, the medical expert testified such pain would not be severe and was treatable. Overall, the undersigned finds that the claimant's subjective complaints are not supported by the record.

(Tr. at 16-19).

## 1. PRIOR WORK RECORD

The ALJ noted that plaintiff was able to work for years with his eye impairment, and indeed his earnings record establishes that. From 1994 through 2002, plaintiff had significant earnings despite his vision impairment. This factor supports the ALJ's credibility determination.

## 2. DAILY ACTIVITIES

Plaintiff stated through testimony and his administrative records that his ability to care for himself has not changed since his disability. He is able to prepare soup, grill hamburgers and steaks, bake potatoes, make frozen dinners and pizza. He has no difficulty preparing meals because of his disability. He has no difficulty following directions. He needs no help doing grocery shopping. He is able to do dishes, mop, dust, vacuum, clean the house, do laundry, carry out the trash, play the guitar, play chess, go to concerts, and drive. Plaintiff drives to the grocery store, to the pet store, to fast food restaurants, and to the doctor. If plaintiff's inability to see while he was driving was as bad as he claims, it is implausible that he would risk driving to a pet store or a fast food restaurant.

37

This factor supports the ALJ's credibility determination.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Dr. Gelzer testified that Dr. Gemperli's failure to treat plaintiff's eye pressure and watering problems with medication makes him question the severity of the problem. Eye pain and irritation can be treated with lubricating drops, topical steroids, and sometimes oral steroids. However, there is no evidence that these treatments were ever tried. In addition, there is very little evidence of plaintiff's seeking regular treatment for his impairments.

Plaintiff's mother testified that over the past two years, plaintiff's condition has worsened; however, there is very little evidence of plaintiff's seeking treatment for this worsened condition.

Plaintiff testified that his allergies and asthma cause severe problems; however, the only evidence in the record of plaintiff going to an allergist was when he had a skin test done on November 5, 2002 -- two days before he filed his disability application.

There are very few records from plaintiff's treating ophthalmologist, Dr. Gemperli. Plaintiff saw Dr. Gemperli in October 29, 2002 (nine days before he filed his

38

disability application) for a check up, complaining that his eye waters causing headaches, and complaining of floaters. There is no allegation that plaintiff was hard to examine during that visit, and he did not complain of light sensitivity. His vision was 20/25 in the right eye. Plaintiff did not return to see Dr. Gemperli until February 27, 2004 -- 16 months later -- when he needed her to complete a disability questionnaire.

The extreme lack of medical records supports the ALJ's credibility determination, as if plaintiff's symptoms were as bad as he alleges, he certainly would have sought treatment more frequently. There is no explanation in the record for plaintiff's failure to obtain medical treatment for his allegedly disabling impairments.

**4.    *PRECIPITATING AND AGGRAVATING FACTORS***

There is no evidence of precipitating or aggravating factors in the record.

**5.    *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff's mother testified that plaintiff's doctors have tried to treat him for light sensitivity, but he is allergic to all of the different kinds of drops. There is no evidence in the record to support this. In 1979, plaintiff's mother stopped giving him the Timoptic drops

39

because she thought it may be causing her son's headaches. However, three years later, in August 1982, plaintiff was using the Timoptic eye drops and stated he was having no problems with his left eye, the discomfort was negligible, and the vision in his right eye was satisfactory.

In December 2002, plaintiff told Dr. Aks that the Vioxx, Skelaxin, and Ulracet were giving him "much benefit".

In January 2003, plaintiff told Dr. Aks that the epidural steroid injections were beneficial, his back pain was decreased and less frequent. Although he testified that the benefit wore off and the pain got worse, plaintiff never reported this alleged increased pain to any doctor.

The record establishes that plaintiff was not on severe pain medication, and that the medication treatment he received worked well for him. This factor supports the ALJ's credibility determination.

## 6. FUNCTIONAL RESTRICTIONS

As the ALJ pointed out, no doctor has ever restricted plaintiff's activities to the level he claims. In October 2002, Dr. Reed restricted plaintiff to medium light work, lifting 35 pounds, for four weeks. Plaintiff was to do no frequent, repetitive, or continuous bending or twisting. No other restrictions were imposed.

40

In November 2002, physical therapist Jacqueline Worthington found that plaintiff could function in the medium work physical demand category for full time employment. This was based on plaintiff's actual abilities, not an estimate. Plaintiff was able to lift 35 to 50 pounds in various capacities, he could push and pull a cart with 275 pounds, he could stand, sit, walk, climb stairs, climb ladders, balance, stoop, kneel, crouch, crawl, reach overhead, reach desk level, reach floor level, grip with his hands, handle, and finger.

In January 2003, plaintiff was returned to regular duties at work by Dr. Aks, plaintiff's treating physician.

In February 2003, Dr. Higgins found that plaintiff could occasionally lift 20 pounds; frequently lift ten pounds; stand, walk, or sit for six hours each; could push or pull; could occasionally crouch and stoop; could frequently climb, balance, kneel, and crawl.

There is no evidence to support plaintiff's alleged functional limitations. This factor supports the ALJ's credibility determination.

**B.    *CREDIBILITY CONCLUSION***

Plaintiff claimed that he left his warehouse job after almost nine years because his eye problems got progressively

41

worse; however, there is no evidence that plaintiff sought treatment for those progressively worse eye problems. The ALJ noted that plaintiff's alleged onset date seems to coincide with his back problem, which is not disabling as plaintiff was released to return to work without any limitations just a few months later.

Plaintiff testified that on average he was missing a day of work per week due to eye swelling and headaches; however, he saw Dr. Gemperli on October 29, 2002, and failed to complain of swelling. Additionally, there is no evidence that plaintiff was prescribed anything for his headaches, leading to the conclusion that they were not disabling.

Plaintiff testified that he gets an allergy shot every week; however, there is no evidence that plaintiff ever was treated by an allergist. The only medical record from an allergist shows that plaintiff had a skin test around the time he applied for disability benefits.

Plaintiff's mother testified that plaintiff was supposed to have surgery to remove his eye when he was a teenager, but the medical records establish that plaintiff was actually scheduled for a surgery to reduce the internal pressure of the eye, not removal of the eye.

42

The records also establish that despite plaintiff's alleged disabling eye condition, he did not receive regular treatment by any eye care professional after he turned 17 in 1982.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's determination that plaintiff's testimony is not entirely credible.

**VII. OPINION OF TREATING PHYSICIAN**

Plaintiff next argues that the ALJ erred in failing to give controlling weight to plaintiff's treating ophthalmologist, Amy Gemperli, M.D.

A treating physician's opinion does not automatically control, but it should be given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Cain v. Barnhart, 2006 WL 2661157 (8th Cir. (Mo.), September 18, 2006), quoting Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). However, a physician's medical source statement addresses the applicant's residual functional capacity to work, which is a determination the Commissioner must make. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "A treating

physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record." <u>Cain v. Barnhart</u>, <u>supra</u>; <u>Stormo v. Barnhart</u>, 377 F.3d 801, 805-06 (8th Cir. 2004); <u>Hogan v. Apfel</u>, 239 F.3d 958, 961 (8th Cir. 2001); Social Security Ruling 96-2p, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions (July 2, 1996).

If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Plaintiff specifically argues that the ALJ should have adopted the opinion of Dr. Gemperli in the vision interrogatories completed on February 27, 2004. Dr. Gemperli found that plaintiff has congenital glaucoma, as supported by increased intraocular pressure, and records

44

dating to the late 1960's detailing the history of plaintiff's congenital glaucoma. The condition does not affect both eyes, and Dr. Gemperli found that plaintiff has 20/20 vision in his best eye after correction. Dr. Gemperli was asked the following questions:

Is it reasonable to expect that the patient would experience frequent headaches? "yes"

Is it reasonable to expect that a person afflicted by this disorder would be subject to easy eye-fatigue? "yes"

Because of easy-eye fatigue, would the patient have to rest eyes frequently? "yes"

Would the patient have difficulty concentrating his/her vision on an object for periods of two hours? "yes"

Would the patient experience frequent occasions when he/she would have "double vision"? "no"

Would the patient experience a loss or diminution of depth perception? "yes"

Would the patient experience tunnel or gun barrel vision? "no"

Has the patient experienced retinal hemorrhaging? "no"

Would the patient experience difficulty in reading? "yes"

Would it be reasonable to expect that the patient's eyes would water excessively? "yes"

Do you believe the patient has the ability to complete a normal day of work and work week without interruptions and to perform at a consistent pace without unnecessary numbers and lengths of rest periods? "no"

Case 4:05-cv-00873-REL   Document 15   Filed 09/25/06   Page 45 of 51

Finally, Dr. Gemperli wrote that the symptoms described in this questionnaire have been present since birth.

The ALJ had this to say about the opinion of Dr. Gemperli:

> He was treated by ophthalmologist Amy Gemperli, M.D., who specialized in glaucoma. Her records show he complained of watery eyes on one occasion in 2002, said he saw floaters, and he was extremely sensitive to light in his right eye. Dr. Gemperli recorded his right eye vision as 20/25 and she noted he had no light perception in the left eye. Intraocular pressure was 16 in the right eye, which was normal, and 40 in the left eye. . . . On dilated examination, the right eye was normal. Additionally, the claimant was extremely sensitive to light and, therefore, difficult to examine.
>
> Dr. Gemperli completed Vision interrogatories on February 27, 2004. . . .
>
> . . . Despite [plaintiff's] congenital left eye blindness, the claimant has worked with his vision impairment. He does not proffer any explanation of why his vision would have prevented him from continuing to work on September 10, 2002, but not before that date. . . . The medical expert noted there was no treatment for the complaints of the swelling, pain and watery left eye and no investigation of the cause for light sensitivity in the right eye. While it is reasonable that he may experience increased pain due to atrophy, the medical expert testified such pain would not be severe and was treatable.

(Tr. at 18-19).

**A.    *LENGTH OF TREATMENT RELATIONSHIP***

The records show that plaintiff first saw Dr. Gemperli on October 29, 2002. His vision was 20/25 in the right eye

46

on that visit.  His next visit was on February 27, 2004 --
sixteen months later, with no other eye treatment during
that time.  During that visit, plaintiff's chief complaint
was noted as "Pt needs form filled out for disability".
Plaintiff's vision was 20/20 in his right eye.  It was that
day that Dr. Gemperli completed the vision interrogatories.

Therefore, the length of treatment hardly gives Dr.
Gemperli's opinion more weight than that of the medical
expert who testified at the hearing.  At the time the vision
interrogatories were completed, Dr. Gemperli had seen
plaintiff only one time almost a year and a half earlier.
The exam she performed the day of the interrogatories showed
that plaintiff had 20/20 vision in his right eye.

## B.    *FREQUENCY OF EXAMINATIONS*

As discussed above, plaintiff saw Dr. Gemperli only
very infrequently; as a matter of fact, only one time for a
check up and one time for a disability exam and completion
of the vision interrogatories.  By December 14, 2004, the
date Dr. Gemperli wrote a letter to plaintiff's attorney in
relation to his disability application, plaintiff still had
not returned to her for any further check ups or treatment.

This factor does not afford Dr. Gemperli's opinion any
more weight than that of a non-treating physician.

### C. NATURE AND EXTENT OF THE TREATMENT RELATIONSHIP

Again, as discussed above, the extent of plaintiff's treatment relationship with Dr. Gemperli was extremely brief; and the nature of the relationship appears to be almost exclusively to support his disability application. Plaintiff saw Dr. Gemperli for one check up in 2002. He did not return to see her again until 2004 when he requested her opinion for his disability application. After his check up in February 2004 when he requested that she complete vision interrogatories, he never returned to her again for any kind of check up or treatment.

### D. SUPPORTABILITY BY MEDICAL SIGNS AND LABORATORY FINDINGS

It appears to be undisputed that plaintiff is blind in his left eye and experiences light sensitivity in his right eye. Even Dr. Gemperli did not exaggerate the extent of plaintiff's vision problems, finding that his vision is nearly perfect in his right eye. She also found that all of the symptoms she described in the vision interrogatories had been present "since birth"; therefore, Dr. Gemperli's opinion as to whether plaintiff could work with those symptoms is irrelevant -- plaintiff DID work with those symptoms for many years. There is no evidence whatsoever that plaintiff's vision problems or symptoms worsened, other

48

than his non-credible testimony.  There is no evidence that plaintiff was ever treated for increased pain, increased light sensitivity, or any other symptom he claims now disables him.

**E. *CONSISTENCY OF THE OPINION WITH THE RECORD AS A WHOLE***

Probably the most important factor here is the fact that Dr. Gemperli's responses in the vision interrogatories, i.e., that plaintiff would be unable to perform a job at a consistent pace without interruptions from rest periods, is inconsistent with plaintiff's prior work record.  Dr. Gemperli's opinion was not that plaintiff's condition had worsened recently.  Her opinion was that plaintiff's condition had been consistent since birth.  Since that time, plaintiff was able to work for many years making significant earnings.

**F. *SPECIALIZATION OF THE DOCTOR***

It is undisputed that Dr. Gemperli is a glaucoma specialist.  However, again, her opinion as to plaintiff's eye condition appears to mirror that of the medical expert. It is only her opinion as to how that condition affects plaintiff's ability to work that is unsupported by the record.

49

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. Gemperli as to how plaintiff's eye condition affects his ability to work.

## VIII. HYPOTHETICAL

Finally, plaintiff argues that the ALJ erred in failing to incorporate into the hypothetical the need to take additional breaks throughout the day to rest his eyes. As discussed at length above, there is no credible evidence that plaintiff is required to take numerous breaks throughout the day, in excess of the normal breaks allowed by all employers. Therefore, plaintiff's motion for judgment on this basis will be denied.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision to find plaintiff not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 25, 2006

51